## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

PATRICIA BROWNE ARTHUR, Derivatively
on Behalf of FANNIE MAE f/k/a FEDERAL
NATIONAL MORTGAGE ASSOCIATION,
    30 Resevoir Road
    Atherton, CA 94027

                    Plaintiff,

vs.

DANIEL H. MUDD,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

ROBERT J. LEVIN,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

MICHAEL J. WILLIAMS,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

THOMAS A. LUND,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

PETER S. NICULESCU,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

WILLIAM B. SENHAUSER,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

KENNETH J. BACON,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

LINDA K. KNIGHT,
    c/o Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016

[Caption continued on the following page]

) Case No.
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

NOV 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Case: 1:07-cv-02130
Assigned To : Friedman, Paul L.
Assign. Date : 11/26/2007
Description: General Civil



ROBERT T. BLAKELY,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

BETH A. WILKINSON,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

DAVID C. HISEY,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

STEPHEN M. SWAD,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

H. PATRICK SWYGERT,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

STEPHEN B. ASHLEY,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

JOE K. PICKETT,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

LESLIE RAHL,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

JOHN K. WULFF,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

GREG C. SMITH,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

BRIDGET A. MACASKILL,
   c/o Fannie Mae
   3900 Wisconsin Avenue, NW
   Washington, DC 20016

[Caption continued on following page]

DENNIS R. BERESFORD,                         )
   c/o Fannie Mae                            )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
BRENDA J. GAINES,                            )
   c/o Fannie Mae                            )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
KAREN N. HORN,                               )
   c/o Fannie Mae                            )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
LOUIS J. FREEH,                              )
   c/o Fannie Mae                            )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
JOHN C. SITES, JR.,                          )
   79 Harbor Dr.                             )
   Greenwich, CT 06830-7019                  )
                                )
THOMAS P. GERRITY                            )
   c/o Fannie Mae                            )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
and                                          )
                                )
KENNETH M. DUBERSTEIN,                       )
   c/o Fannie Mae                            )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
            Defendants,                   )
                                )
   -and-                                     )
                                )
FANNIE MAE f/k/a FEDERAL NATIONAL            )
MORTGAGE ASSOCIATION, a Federally            )
chartered corporation,                       )
   3900 Wisconsin Avenue, NW                 )
   Washington, DC 20016                      )
                                )
         Nominal Defendant.               )
——————————————————————) DEMAND FOR JURY TRIAL

**VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATION OF SECTIONS 10(b) AND 20(a) THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of Fannie Mae f/k/a Federal National Mortgage Association ("Fannie Mae" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between May 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to Fannie Mae and other damages, such as to its reputation and goodwill.

2.    Fannie Mae provides funds to mortgage lenders through the purchase of mortgage assets, and issues and guarantees mortgage-related securities that facilitate the flow of funds into the mortgage market.  During the summer of 2006, a declining housing market and increasing delinquency rate among mortgage lenders caused a crisis in the mortgage market as the value of mortgage backed securities declined substantially.  Fannie Mae as a purchaser of mortgage related assets was not immune to this crisis.

3.    The defendants, however, sought to take advantage of a gap in Fannie Mae's financial reporting to conceal the Company's exposure.  This gap existed because of a $6.3 billion accounting scandal dating back to 2003.  In fact, before the Relevant Period, Fannie Mae had not filed a financial report with the Securities and Exchange Commission ("SEC") since 2004.

4.    Thus, throughout the Relevant Period, under defendants' direction Fannie Mae never disclosed the full extent of its exposure to the subprime mortgage crisis.  In fact, Fannie Mae merely issued monthly reports concerning the gross value of its mortgage portfolio.  Although Fannie Mae eventually disclosed that $47.2 billion of the portfolio consisted of securities backed by subprime loans, Fannie Mae emphasized that $46.9 billion of those securities were rated AAA.

5.    As a result of defendants' failure to act, the truth concerning Fannie Mae's exposure was not revealed until November 9, 2007.  On that day, Fannie Mae and defendants disclosed that

the Company's earnings for the first three quarters of fiscal 2007 had declined by over *$2 billion* due to exposure to the subprime mortgage crisis.

6.      While defendants were directing Fannie Mae to conceal its exposure to the subprime market crisis, they were also directing Fannie Mae to repurchase over $2.6 million worth of its own shares at artificially inflated prices. Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $13 million in proceeds.

7.      Currently, Fannie Mae's credibility with investors has been devastated. During the Relevant Period, the Company's value declined from over $69 per share to less than $30 per share—a $38.1 billion market capitalization loss.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Fannie Mae maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful

acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Fannie Mae occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

11.    Plaintiff Patricia Browne Arthur is and was, at all times relevant hereto, an owner and holder of Fannie Mae common stock. Plaintiff is a citizen of California.

12.    Nominal defendant Fannie Mae is a Federally chartered corporation with its principal executive offices located at 3900 Wisconsin Avenue, NW, Washington, District of Columbia. Fannie Mae provides funds to mortgage lenders through the purchase of mortgage assets, and issues and guarantees mortgage-related securities.

13.    Defendant Daniel H. Mudd ("Mudd") is Fannie Mae's President and Chief Executive Officer ("CEO") and has been since June 2005. Mudd is also a Fannie Mae director and has been since February 2000. Mudd was Fannie Mae's Vice Chairman of the Board from February 2000 to June 2005; Interim CEO from December 2004 to June 2005; and Chief Operating Officer from February 2000 to December 2004. Mudd is Fannie Mae Foundation's Chairman of the Board and has been since June 2005. Mudd was Fannie Mae Foundation's Interim Chairman of the Board from Dcember 2004 to June 2005 and Vice Chairman from September 2003 to December 2004. Because of his positions, defendant Mudd knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Mudd participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Mudd received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $950,000 | $4,799,057 | $962,112 | $3,500,000 | $932,958 | $136,072 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $908,121 | $2,591,875 | $9,487,221 | | | $155,539 |
| 2004 | $743,895 | - | $5,524,381 | - | - | $63,815 |
| 2003 | $714,063 | $1,288,189 | - | 105,749 | $4,674,015 | $135,989 |
| 2002 | $689,124 | $911,250 | - | 82,918 | $2,339,702 | $64,454 |
| 2001 | $656,429 | $1,083,109 | - | 87,194 | $1,188,846 | $9,732 |
| 2000 | $537,063 | $735,130 | $1,319,533 | 321,295 | $414,090 | $607,848 |

Defendant Mudd sold 42,606 shares of Fannie Mae stock for $2,342,304.24 in proceeds while in possession of material non-public information. Defendant Mudd is a citizen of the District of Columbia.

14.    Defendant Robert J. Levin ("Levin") is Fannie Mae's Executive Vice President and Chief Business Officer and has been since November 2005. Levin was Fannie Mae's Interim Chief Financial Officer ("CFO") from December 2004 to January 2006; Executive Vice President of Housing and Community Development from June 1998 to December 2004; and Executive Vice President—Marketing from June 1990 to June 1998. Because of his positions, defendant Levin knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Levin participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Levin received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $750,000 | $2,477,097 | $883,442 | $2,087,250 | $307,078 | $70,710 |

-4-

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $678,442 | $3,918,750 | $4,269,702 | - | - | $58,285 |
| 2004 | $590,923 | - | $3,125,480 | - | - | $56,303 |
| 2003 | $567,706 | $801,237 | $227,789 | 100,613 | $2,706,381 | $10,875 |
| 2002 | $480,092 | $575,000 | - | 72,445 | $1,947,368 | $10,761 |
| 2001 | $457,317 | $686,028 | - | 44,735 | $1,987,119 | $10,367 |
| 2000 | $435,540 | $544,425 | - | 100,002 | $2,088,542 | $13,920 |

Defendant Levin sold 89,678 shares of Fannie Mae stock for $5,326,931.60 in proceeds while in possession of material non-public information. Defendant Levin is a citizen of Maryland.

15.    Defendant Michael J. Williams ("Williams") is Fannie Mae's Executive Vice President and Chief Operating Officer and has been since November 2005. Williams was Fannie Mae's Executive Vice President for Regulatory Agreements and Restatement from February 2005 to November 2005; President—Fannie Mae eBusiness from July 2000 to February 2005; and Senior Vice President—e-commerce from July 1999 to July 2000. Williams held various positions with Fannie Mae's Single-Family and Corporate Information Systems Division from 1991 to July 1999. Because of his positions, defendant Williams knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Williams participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Williams received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $650,000 | $1,808,182 | $701,446 | $1,630,200 | $371,753 | $69,482 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $532,624 | $3,014,770 | $3,361,496 | - | - | $44,854 |
| 2004 | $495,169 | - | $2,194,110 | - | - | $43,427 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2003 | $471,415 | $663,129 | - | 73,880 | $1,274,349 | $9,019 |
| 2002 | $428,195 | $520,000 | - | 63,836 | $443,137 | $8,999 |

Defendant Williams sold 38,935 shares of Fannie Mae stock for $2,249,433.87 in proceeds while in possession of material non-public information. Defendant Williams is a citizen of Maryland.

16. Defendant Thomas A. Lund ("Lund") is Fannie Mae's Executive Vice President— Single Family Mortgage Business and has been since July 2005. Lund was Fannie Mae's Interim head of Single-Family Mortgage Business from January 2005 to July 2005; Senior Vice President— Chief Acquisitions Office from January 2004 to January 2005; Senior Vice President—Investor Channel from August 2000 to January 2004; Senior Vice President—Southwestern Regional Office, Dallas, Texas from July 1996 to July 2000; and Vice President for Marketing from January 1995 to July 1996. Because of his positions, defendant Lund knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Lund participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Lund received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2005 | $411,336 | $1,791,900 | $1,724,476 | $26,259 |

Defendant Lund sold 14,032 shares of Fannie Mae stock for $835,702.09 in proceeds while in possession of material non-public information. Defendant Lund is a citizen of Maryland.

17. Defendant Peter S. Niculescu ("Niculescu") is Fannie Mae's Executive Vice President—Capital Markets and has been since November 2002. Niculescu was Fannie Mae's Senior Vice President—Portfolio Strategy from March 1999 to November 2002. Because of his positions, defendant Niculescu knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Niculescu participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other

statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Niculescu received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $538,188 | $1,388,328 | $533,816 | $1,029,060 | $232,562 | $39,906 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2005 | $512,130 | $1,795,154 | $1,797,643 | $36,187 |

Defendant Niculescu sold 12,462 shares of Fannie Mae stock for $678,084.74 in proceeds while in possession of material non-public information. Defendant Niculescu is a citizen of Virginia.

18.     Defendant William B. Senhauser ("Senhauser") is Fannie Mae's Senior Vice President and Chief Compliance Officer and has been since December 2005. Senhauser was Fannie Mae's Vice President for Regulatory Agreements and Restatement from October 2004 to December 2005; Vice President for Operating Initiatives from January 2003 to September 2004; and Vice President, Deputy General Counsel from November 2000 to January 2003. Because of his positions, defendant Senhauser knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Senhauser participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Senhauser sold 10,482 shares of Fannie Mae stock for $630,011.34 in proceeds while in possession of material non-public information. Defendant Senhauser is a citizen of Maryland.

19.     Defendant Kenneth J. Bacon ("Bacon") is Fannie Mae's Executive Vice President—Housing and Community Development and has been since July 2005. Bacon was Fannie Mae's Interim Head of Housing and Community Development from January 2005 to July 2005; Senior Vice President—Multifamily Lending and Investment from May 2000 to January 2005; Senior Vice President—American Communities Fund from October 1999 to May 2000; Senior Vice President of

the Community Development Capital Corporation from August 1998 to October 1999; and Senior

Vice President of Fannie Mae's Northeastern Regional Office in Philadelphia from May 1993 to

August 1998. Because of his positions, defendant Bacon knew, consciously disregarded, was

reckless and grossly negligent in not knowing and should have known the adverse non-public

information about the business of Fannie Mae. During the Relevant Period, Bacon participated in

the issuance of improper statements, including the preparation of the improper press releases and

SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae

shareholders. Defendant Bacon sold 8,652 shares of Fannie Mae stock for $480,556.90 in proceeds

while in possession of material non-public information. Defendant Bacon is a citizen of the District

of Columbia.

    20.    Defendant Linda K. Knight ("Knight") is Fannie Mae's Executive Vice President—

Enterprise Operations and has been since April 2007. Knight was Fannie Mae's Executive Vice

President—Capital Markets from March 2006 to April 2007; Senior Vice President and Treasurer

from February 1993 to March 2006; Vice President and Assistant Treasurer from November 1986 to

February 1993; Director, Treasurer's Office from November 1984 to November 1986; Assistant

Director, Treasurer's Office from February 1984 to November 1984; and Senior Market Analyst from

August 1982 to February 1984. Because of her positions, defendant Knight knew, consciously

disregarded, was reckless and grossly negligent in not knowing and should have known the adverse

non-public information about the business of Fannie Mae. During the Relevant Period, Knight

participated in the issuance of improper statements, including the preparation of the improper press

releases and SEC filings and approval of other statements made to the press, securities analysts and

Fannie Mae shareholders. Defendant Knight sold 7,426 shares of Fannie Mae stock for $406,190.63

in proceeds while in possession of material non-public information. Defendant Knight is a citizen of

Virginia.

    21.    Defendant Robert T. Blakely ("Blakely") is Fannie Mae's Executive Vice President

and has been since January 2006. Blakely was Fannie Mae's CFO from January 2006 to August

2007. Because of his positions, defendant Blakely knew, consciously disregarded, was reckless and

grossly negligent in not knowing and should have known the adverse non-public information about

the business of Fannie Mae. During the Relevant Period, Blakely participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Blakely received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $587,500 | $926,250 | $3,898,589 | $364,325 | $209,087 | $140,480 |

Defendant Blakely sold 6,315 shares of Fannie Mae stock for $355,950.21 in proceeds while in possession of material non-public information. Defendant Blakely is a citizen of the District of Columbia.

22.    Defendant Beth A. Wilkinson ("Wilkinson") is Fannie Mae's Executive Vice President—General Counsel and Corporate Secretary and has been since February 2006. Because of her position, defendant Wilkinson knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Wilkinson participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Wilkinson received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $490,961 | $1,748,750 | $396,712 | $199,238 | $198,413 | $35,578 |

Defendant Wilkinson sold 3,763 shares of Fannie Mae stock for $222,957.75 in proceeds while in possession of material non-public information. Defendant Wilkinson is a citizen of the District of Columbia.

23.    Defendant David C. Hisey ("Hisey") is Fannie Mae's Senior Vice President and Controller and has been since February 2005. Hisey was Fannie Mae's Senior Vice President, Financial Controls and Operations from January 2005 to February 2005. Because of his positions, defendant Hisey knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Hisey participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Hisey sold 2,929 shares of Fannie Mae stock for $166,591.19 in proceeds while in possession of material non-public information. Defendant Hisey is a citizen of Virginia.

24.    Defendant Stephen M. Swad ("Swad") is Fannie Mae's Executive Vice President and has been since May 2007. Swad is also Fannie Mae's CFO and has been since August 2007. Swad was Fannie Mae's CFO Designate from May 2007 to August 2007. Because of his positions, defendant Swad knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Swad participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Swad is a citizen of Maryland.

25.    Defendant H. Patrick Swygert ("Swygert") is a Fannie Mae director and has been since January 2000. Swygert is Chairman of Fannie Mae's Housing and Community Finance Committee and a member of the Risk Policy and Capital Committee and has been since at least 2007. Because of his positions, defendant Swygert knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Swygert participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Swygert is a citizen of the District of Columbia.

26.    Defendant Stephen B. Ashley ("Ashley") is Fannie Mae's Chairman of the Board and has been since December 2004 and a director and has been since May 1995. Ashley is a member of Fannie Mae's Audit Committee and Compensation Committee and has been since 2006. Ashley is also a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee and has been since at least 2007. Defendant Ashley is Chairman and CEO of the Ashley Group, a group of commercial and multifamily real estate, brokerage and investment companies and has been since 1995. Ashley was also Chairman and CEO of Sibley Mortgage Corporation, a commercial, multifamily and single-family mortgage banking firm from 1991 to 1995. Because of his positions and expertise, defendant Ashley knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Ashley participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Ashley is a citizen of New York.

27.    Defendant Joe K. Pickett ("Pickett") is a Fannie Mae director and has been since May 1996. Pickett has elected not to stand for re-election at the 2007 Annual Meeting to be held in December 2007. Pickett is a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee and has been since at least 2007. Because of his positions, defendant Pickett knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Pickett participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Pickett sold 2,094 shares of Fannie Mae stock for $170,784.24 in proceeds while in possession of material non-public information. Defendant Pickett is a citizen of Alabama.

28.    Defendant Leslie Rahl ("Rahl") is a Fannie Mae director and has been since February 2004. Rahl is Chairman of Fannie Mae's Risk Policy and Capital Committee and has been since 2006. Rahl is also a member of Fannie Mae's Housing and Community Finance Committee and has

been since at least 2007. Rahl is President and founder of Capital Market Risk Advisors, Inc., a financial advisory firm specializing in risk management, hedge funds and capital market strategy. Because of her positions and expertise, defendant Rahl knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Rahl participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Rahl is a citizen of New York.

29.    Defendant John K. Wulff ("Wulff") is a Fannie Mae director and has been since December 2004. Wulff is a member of Fannie Mae's Audit Committee and has been since 2006. Because of his positions, defendant Wulff knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Wulff participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Wulff is a citizen of Vermont.

30.    Defendant Greg C. Smith ("Smith") is a Fannie Mae director and has been since April 2005. Smith is a member of Fannie Mae's Audit Committee and Compensation Committee and has been since 2006. Because of his positions, defendant Smith knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Smith participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Smith is a citizen of Mississippi.

31.    Defendant Bridget A. Macaskill ("Macaskill") is a Fannie Mae director and has been since December 2005. Macaskill is Chairman of Fannie Mae's Compensation Committee and has been since 2006. Macaskill is also the principal of BAM Consulting, LLC, a financial services consulting firm and has been since 2003. Macaskill, at various times, was Chairman, CEO and

President of the Oppenheimer Funds, Inc. from 1991 to 2001. Because of her positions and expertise, defendant Macaskill knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Macaskill participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Macaskill is a citizen of New York.

33.    Defendant Dennis R. Beresford ("Beresford") is a Fannie Mae director and has been since May 2006. Beresford is Chairman of Fannie Mae's Audit Committee and has been since 2006. Beresford was a member of Fannie Mae's Compensation Committee from May 2006 to July 2007. Because of his positions, defendant Beresford knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Beresford participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Beresford is a citizen of Georgia.

33.    Defendant Brenda J. Gaines ("Gaines") is a Fannie Mae director and has been since September 2006. Gaines is a member of Fannie Mae's Compensation Committee and Housing and Community Finance Committee and has been since September 2006. Because of her positions, defendant Gaines knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Gaines participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Gaines is a citizen of Illinois.

34.    Defendant Karen N. Horn ("Horn") is a Fannie Mae director and has been since September 2006. Horn is a member of Fannie Mae's Audit Committee and Risk Policy and Capital Committee and has been since September 2006. Horn is also the senior managing director of Brock Capital Group, LLC, an advisory and investment firm and has been since 2003. Because of her

-13-

positions and expertise, defendant Horn knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Horn participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Horn is a citizen of Connecticut.

35.    Defendant Louis J. Freeh ("Freeh") is a Fannie Mae director and has been since May 2007. Freeh is a member of Fannie Mae's Compensation Committee and has been since May 2007. Because of his positions, defendant Freeh knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Freeh participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Freeh is a citizen of Delaware.

36.    Defendant John C. Sites, Jr. ("Sites") is a Fannie Mae director and has been since October 2007. Sites is a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee and has been since 2007. Sites is also a consultant to Wexford Capital, LLC, an investment advisor, and has been since September 2006. Sites was a general partner of Daystar Special Situations Fund, a private equity fund from January 1996 to August 2006. Because of his positions and expertise, defendant Sites knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Sites participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Sites is a citizen of Connecticut.

37.    Defendant Thomas P. Gerrity ("Gerrity") was a Fannie Mae director from 1991 to December 2006. Because of his position, defendant Gerrity knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public

-14-

information about the business of Fannie Mae. During the Relevant Period, Gerrity participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Gerrity is a citizen of Pennsylvania.

38.    Defendant Kenneth M. Duberstein ("Duberstein") was a Fannie Mae director from 1998 to February 2007. Because of his position, defendant Duberstein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Fannie Mae. During the Relevant Period, Duberstein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Duberstein is a citizen of the District of Columbia.

39.    The defendants identified in ¶¶13, 25-38 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-24 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶ 13-23, 27 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

40.    By reason of their positions as officers, directors and/or fiduciaries of Fannie Mae and because of their ability to control the business and corporate affairs of Fannie Mae, the Individual Defendants owed Fannie Mae and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Fannie Mae in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fannie Mae and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41.    Each director and officer of the Company owes to Fannie Mae and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual

-15-

Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fannie Mae, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Fannie Mae, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Fannie Mae.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fannie Mae, and was at all times acting within the course and scope of such agency.

44.     To discharge their duties, the officers and directors of Fannie Mae were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Fannie Mae were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how Fannie Mae conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable law; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

45.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fannie Mae, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants knew or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company during the Relevant Period, have been ratified by the remaining Individual Defendants who collectively comprised all of Fannie Mae's Board during the Relevant Period.

46.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at Fannie Mae and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) result in the sale of over $13 million of the Insider Selling Defendants' personally held shares; and (iv) deceive the investing public, including shareholders of Fannie Mae, about the Individual Defendants' management of Fannie Mae's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that were misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

49.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Fannie Mae was misrepresenting its business prospects.

50.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

51.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

52.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE SUBPRIME MORTGAGE CRISIS

53.     During times relevant hereto, the Individual Defendants knew that a crisis was arising involving mortgages made to subprime borrowers. A subprime borrower is someone with a low credit score, higher debt-to-income ratio or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers. In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property. But in an environment of depreciating home prices, increasing default rates are the norm.

54.     As early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially because the risk of delinquency would be heightened by a downturn in the housing market.

55.     For example, on August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as ... subprime mortgages for low-income home buyers." As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, easy financing helps people buy homes, but also raises foreclosure risks.

56.     Similarly, at the CPR and CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans.

57.     In a December 26, 2005 *Business Week* article, JPMorgan Chase & Co. estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

58.     Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006. In her speech, Bies noted that the Federal Reserve and other banking supervisors were concerned that then-current risk-management

techniques did not fully address the level of risk in nontraditional mortgages such as subprime mortgages—a risk that would be heightened by a downturn in the housing market. Bies also stated that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

59.    These concerns rang true in 2006, as a subprime mortgage crisis erupted. During the first stage of the crisis, several prominent subprime lenders, including New Century Financial Corporation, declared bankruptcy because liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

60.    The Individual Defendants knew that Fannie Mae, as a purchaser of mortgage assets and grantor of mortgage-related securities, would be exposed to losses as a result of the subprime mortgage crisis. Nonetheless, the Individual Defendants failed to direct Fannie Mae to properly disclose the true extent of that exposure in the improper statements alleged below.

## IMPROPER STATEMENTS

61.    The Individual Defendants, by their fiduciary duties of care, good faith and loyalty, owe to Fannie Mae a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

62.    This material, non-public information principally included Fannie Mae's exposure to the subprime lending market crisis. Furthermore, defendants Ashley, Beresford, Horn, Smith and Wulff, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing financial information and earnings guidance provided to analysts and rating agencies.

63.    Defendants Mudd, Levin, Williams, Lund, Niculescu, Senhauser, Bacon, Knight, Blakely, Wilkinson, Hisey and Swad had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.

Moreover, Mudd, Ashley, Pickett, Swygert, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines, Horn, Freeh, Sites, Gerrity and Duberstein as directors of Fannie Mae, had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inaction, the following improper statements to be disseminated by Fannie Mae to the investing public and the Company's shareholders during the Relevant Period.

64.     Through most of the Relevant Period (May 2006 through August 2007), Fannie Mae did not issue any earnings press releases or filings concerning the Company's financial results in that period due to a $6.3 billion accounting scandal dating back to 2003. Instead, the Individual Defendants caused or allowed Fannie Mae to issue monthly reports concerning Fannie Mae's gross mortgage portfolio balances.

65.     On July 27, 2007, the Individual Defendants caused or allowed Fannie Mae to issue one of those monthly reports for June 2007. This report disclosed that Fannie Mae's portfolio included $47.2 billion of securities backed by subprime loans. The report, however, emphasized that $46.9 billion of those securities were rated AAA and had not been downgraded. In particular, the summary reported as follows:

- As shown in Table 5, Fannie Mae's non-agency securities totaled $122.8 billion as of the end of the second quarter of 2007, including $47.2 billion of non-agency securities backed by subprime loans. Of this $47.2 billion, approximately $46.9 billion *was rated AAA* or the equivalent by at least two nationally recognized statistical rating organizations, had an overall weighted average credit enhancement of 32%, and had a minimum credit enhancement of 13%, in each case as of the end of the second quarter of 2007. As of the date of this monthly summary, *none of our $47.2 billion subprime-backed securities have had a ratings downgrade.*

66.     On August 16, 2007, the Individual Defendants caused or allowed Fannie Mae to issue its fiscal 2006 annual report on Form 10-K. The filing reported $4.059 billion in net income for the year. The filing also disclosed, in a general fashion, Fannie Mae's exposure to subprime loans. The filing, however, omitted specific details concerning how the exposure would affect Fannie Mae's future earnings. In particular, the filing provided as follows:

We are exposed to credit risk on our mortgage credit book of business because either we hold the mortgage assets in our portfolio, which consists of mortgage loans, Fannie Mae MBS and non-Fannie Mae mortgage-related securities, or we have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets. Borrowers of mortgage loans that we own or that back our Fannie Mae MBS or non-Fannie Mae mortgage-related securities may fail to make the required payments of principal and interest on those loans, exposing us to the risk of credit losses. Factors that affect the level of our risk of credit losses include the financial strength and credit profile of the borrower, the structure of the loan, the type and characteristics of the property securing the loan, and local, regional and national economic conditions.

For example, loans that have unpaid principal balances that are high in relation to the value of the property, which are commonly referred to as loans with high loan-to-value ("LTV") ratios, generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. The LTV ratio of an outstanding mortgage loan changes as the unpaid principal balance of the loan and the value of the property securing the loan change. Depending on the structure of the loan, the unpaid principal balance of the loan may increase or decrease over time. Similarly, depending on local, regional and national economic conditions, or the underlying supply and demand for housing, the value of the property securing the loan may increase or decrease over time. As of December 31, 2006, approximately 10% of our conventional single-family mortgage credit book of business consisted of loans with a mark-to-market estimated loan-to-value ratio greater than 80%.

The proportion of higher risk mortgage loans that were originated in the market between 2003 and mid-2006 increased significantly. As a result, our purchase and securitization of loans that pose a higher credit risk, such as negative-amortizing adjustable-rate mortgages ("ARMs"), interest-only loans and subprime mortgage loans, also increased, although to a lesser degree than many other institutions. In addition, we increased the proportion of reduced documentation loans that we purchased to hold or to back our Fannie Mae MBS.

For example, negative-amortizing ARMs represented approximately 3% of our conventional single-family business volume in both 2005 and 2006. Interest-only ARMs represented approximately 9% of our conventional single-family business volume in both 2005 and 2006, and approximately 7% as of June 30, 2007. Negative-amortizing ARMs and interest-only ARMs together represented approximately 6% of our conventional single-family mortgage credit book of business as of December 31, 2005, December 31, 2006, and June 30, 2007.

We also estimate that approximately 12% and 11% of our single-family mortgage credit book of business as of June 30, 2007 and December 31, 2006, respectively, consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans, and approximately 1% of our single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans, including resecuritizations, as of both June 30, 2007 and December 31, 2006. We estimate that subprime loans represented approximately 2.2% of our single-family mortgage credit book of business as of both June 30, 2007 and December 31, 2006, of which approximately 0.2% consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans and approximately 2% consisted of private-label mortgage-related securities backed by subprime mortgage loans, including resecuritizations.

We expect to experience increased delinquencies and credit losses in 2007

-22-

compared with 2006, and the increase in our exposure to credit risk resulting from our purchase or securitization of loans with higher credit risk may cause a further increase in the delinquencies and credit losses we experience. An increase in the delinquencies and credit losses we experience is *likely to reduce* our earnings during that period and also *could adversely affect* our financial condition.

67.    Defendants Mudd and Blakely signed and certified the August 16, 2007 Form 10-K as required under the Sarbanes-Oxley Act of 2002. Additionally, defendants Ashley, Beresford, Freeh, Hisey, Gaines, Horn, Macaskill, Pickett, Rahl, Smith, Swygert and Wulff signed the filing.

68.    On September 25, 2007, the Individual Defendants caused or allowed Fannie Mae to issue a financial monthly summary for August 2007. The summary reported a gross mortgage portfolio balance of $728.9 billion. The report, citing a survey conducted by the Mortgage Bankers Association, reported that the serious delinquency rate among subprime loans increased to a 4-year high of 9.27 percent during the second quarter of 2007 and the delinquency rate among prime loans rose to a 9-year high of 0.98 percent. The report, however, did not disclose the effects that this would have on Fannie Mae's earnings. In particular, the summary reported as follows:

**MORTGAGE MARKET HIGHLIGHTS**

- Pushed up by seasonal factors as well as the relative strength of the multifamily housing market, total residential mortgage debt outstanding (MDO) grew at a compound annual rate of 8.0 percent during the second quarter, accelerating from 7.4 percent in the first quarter, but down from 12.3 percent during the second quarter of 2006.

- According to the Mortgage Bankers Association's National Delinquency Survey, the serious delinquency (loans 90 or more days past due or in the process of foreclosure) rate among subprime loans increased to a 4-year high of 9.27 percent in the second quarter of 2007 while that for prime conventional loans rose to a 9-year high of 0.98 percent.

### THE TRUTH IS REVEALED

69.    On November 9, 2007, Fannie Mae issued its fiscal first quarter through third quarter 2007 quarterly reports on Forms 10-Q. The filings revealed that Fannie Mae's earnings for the three quarters *declined 57%* compared to the same period in 2006. Specifically, Fannie Mae reported that its net income of a mere $1.5 billion for the first three quarters of 2007 compared to $3.5 billion for the first three quarters of 2006. In connection with these results, defendant Mudd admitted during an investor conference call that "the results we reported today reflect the correcting in the housing and mortgage markets, what they are going through right now. Those results, as I said, show that we *are*

-23-

*not immune* to the current market conditions."

70.     On November 19, 2007, the *Associated Press* published an article about analyst

concerns regarding a change in Fannie Mae's accounting methodology used to report its annualized

credit-loss ratio in its recent financial filings for its first through third quarter 2007 financial results.

This methodology change resulted in Fannie Mae reporting a much more favorable credit-loss ratio

(the percentage of Fannie Mae's mortgages that lost value) than what it would have reported under its

previous methodology.  In other words, analysts were questioning whether or not Fannie Mae was

using the new methodology in an attempt to soften the Company's reported exposure to the subprime

mortgage crisis.  The article also reported that Friedman Billings Ramsey analyst Paul J. Miller had

downgraded the Company's shares and reduced his price target to $35 from $60.  In particular, the

article provided as follows:

> On Monday, Fannie Mae's shares, which hit a 10-year low last week, fell
> $3.11, or 7.6 percent, to $37.58 after Friedman Billings Ramsey analyst Paul J. Miller
> Jr. downgraded the company's shares to "Market Perform" from "Outperform" and
> reduced *his price target to $35 from $60*.

*     *     *

> Fannie Mae's shares tumbled last week amid fears that a new accounting
> methodology disclosed by the company masks the number of bad loans it holds.

> While Miller said Fannie and Freddie will ultimately benefit from a shift to
> more traditional lending practices, "investors will first have to get a certain comfort
> level" that mortgage-related losses are stabilizing, he wrote.

> Fannie disclosed its new calculation for potential mortgage losses Nov. 9,
> when it submitted several hundred pages of documents to the Securities and
> Exchange Commission, bringing the company's financial reporting up to date for the
> first time since 2004.

> But a bookkeeping change and its potential impact received significant
> attention last week, and Fannie executives held a conference call on Friday to explain
> the changes.

> Using the new method, Fannie reported a so-called "annualized credit-loss
> ratio" of 0.04 percent for the first nine months of this year, meaning the value of four
> out of every 1,000 mortgages it holds declined during that period.

> **Under the company's old method, the credit-loss ratio for that period would
> have been 0.075 percent -- far exceeding Fannie's forecasts on the $2.4 trillion
> worth of mortgages it owns.**

> As mortgage market turmoil continues, Fannie Mae's losses are likely to rise,

Miller predicted. He forecast Fannie Mae's credit losses will rise as high as 0.15 percent in 2009, above the record high of 0.12 percent in the late 1980s.

## REASONS THE STATEMENTS WERE IMPROPER

71.    Fannie Mae's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)    Fannie Mae's mortgage portfolio was experiencing billions of dollars worth of losses due to the subprime mortgage crisis; and

(b)    Fannie Mae's untimely financial reports did not adequately report that exposure until after the Company's earnings had already declined by $2 billion.

## THE IMPROPER BUYBACK

72.    On or about May 1, 2006 when the housing market was declining, the Board authorized the repurchase of up to $100 million of the Company's shares. Under the Board's authorization, throughout the Relevant Period, while Fannie Mae's stock was artificially inflated due to the improper statements described above, the Company bought back over $2.6 million worth of the Company's own shares at an average price of approximately $59.32 per share, which is substantially higher than Fannie Mae's current share price of less than $30 per share and comparable to the $57.82 per share the Insider Selling Defendants averaged in selling their own Fannie Mae stock holdings during the Relevant Period. On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the subprime mortgage lending crisis and its effect on the Company's business prospects. While Fannie Mae was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

## DAMAGES TO FANNIE MAE CAUSED BY THE INDIVIDUAL DEFENDANTS

73.    As a result of the Individual Defendants' improprieties, Fannie Mae disseminated improper statements that failed to disclose the true extent of Fannie Mae's exposure to the subprime mortgage crisis. These improper statements have devastated Fannie Mae's credibility as reflected by the Company's $38.1 billion market capitalization loss.

-25-

74.     Further, as a direct and proximate result of the Individual Defendants' action, Fannie Mae has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Fannie Mae;

(b)     Costs incurred from the $2.6 million that Fannie Mae spent repurchasing its own inflated stock; and

(c)     Costs incurred from the loss in Fannie Mae's mortgage portfolio due to Fannie Mae's billions of dollars worth of subprime mortgage backed assets and other related assets.

75.     Moreover, these actions have irreparably damaged Fannie Mae's corporate image and goodwill.  For at least the foreseeable future, Fannie Mae will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Fannie Mae's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

76.     The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect.  They also knew that the misstatements would create an inflated stock price.  The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth.  While in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Fannie Mae stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | | | | |
| **BACON** | 10/2/2006 | 718 | $55.14 | $39,590.52 |
| | 1/24/2007 | 2,176 | $56.51 | $122,965.76 |
| | 3/12/2007 | 2,047 | $55.09 | $112,769.23 |
| | 10/1/2007 | 1,192 | $62.01 | $73,915.92 |
| | 11/5/2007 | 2,519 | $52.13 | $131,315.47 |
| | | 8,652 | | $480,556.90 |
| | | | | |
| **BLAKELY** | 1/24/2007 | 5,191 | $56.51 | $293,343.41 |
| | 1/30/2007 | 1,124 | $55.70 | $62,606.80 |

| | | 6,315 | | $355,950.21 |
|---|---|---|---|---|
| | | | | |
| HISEY | 1/3/2007 | 906 | $59.90 | $54,269.40 |
| | 1/24/2007 | 616 | $56.51 | $34,810.16 |
| | 3/12/2007 | 1,407 | $55.09 | $77,511.63 |
| | | 2,929 | | $166,591.19 |
| | | | | |
| KNIGHT | 10/2/2006 | 207 | $55.14 | $11,413.98 |
| | 11/20/2006 | 344 | $57.90 | $19,917.60 |
| | 1/24/2007 | 1,929 | $56.51 | $109,007.79 |
| | 3/12/2007 | 1,817 | $55.09 | $100,098.53 |
| | 10/1/2007 | 267 | $62.01 | $16,556.67 |
| | 11/5/2007 | 2,862 | $52.13 | $149,196.06 |
| | | 7,426 | | $406,190.63 |
| | | | | |
| LEVIN | 10/17/2006 | 25,240 | $57.91 | $1,461,648.40 |
| | 1/23/2007 | 252 | $56.74 | $14,298.48 |
| | 1/24/2007 | 6,917 | $56.51 | $390,879.67 |
| | 3/12/2007 | 8,014 | $55.09 | $441,491.26 |
| | 10/17/2007 | 41,524 | $62.99 | $2,615,596.76 |
| | 11/5/2007 | 7,731 | $52.13 | $403,017.03 |
| | | 89,678 | | $5,326,931.60 |
| | | | | |
| LUND | 10/2/2006 | 2,353 | $55.14 | $129,744.42 |
| | 1/23/2007 | 142 | $56.74 | $8,057.08 |
| | 1/24/2007 | 2,280 | $56.51 | $128,842.80 |
| | 3/12/2007 | 1,567 | $55.09 | $86,326.03 |
| | 10/1/2007 | 1,177 | $62.01 | $72,985.77 |
| | 10/4/2007 | 4,666 | $67.18 | $313,461.88 |
| | 11/5/2007 | 1,847 | $52.13 | $96,284.11 |
| | | 14,032 | | $835,702.09 |
| | | | | |
| MUDD | 1/24/2007 | 14,775 | $56.51 | $834,935.25 |
| | 3/12/2007 | 19,101 | $55.09 | $1,052,274.09 |
| | 11/5/2007 | 8,730 | $52.13 | $455,094.90 |
| | | 42,606 | | $2,342,304.24 |
| | | | | |
| NICULESCU | 11/20/2006 | 422 | $57.90 | $24,433.80 |
| | 1/24/2007 | 2,653 | $56.51 | $149,921.03 |
| | 3/12/2007 | 4,860 | $55.09 | $267,737.40 |
| | 11/5/2007 | 4,527 | $52.13 | $235,992.51 |
| | | 12,462 | | $678,084.74 |
| | | | | |
| PICKETT | 4/20/2007 | 2,904 | $58.81 | $170,784.24 |
| | | 2,904 | | $170,784.24 |
| | | | | |
| SENHAUSER | 10/2/2006 | 269 | $55.14 | $14,832.66 |
| | 1/18/2007 | 235 | $57.14 | $13,427.90 |
| | 1/22/2007 | 110 | $56.82 | $6,250.20 |
| | 1/23/2007 | 143 | $56.74 | $8,113.82 |

| | 1/24/2007 | 488 | $56.51 | $27,576.88 |
|---|---|---|---|---|
| | 1/24/2007 | 579 | $56.51 | $32,719.29 |
| | 3/12/2007 | 1,215 | $55.09 | $66,934.35 |
| | 6/13/2007 | 149 | $68.08 | $10,143.92 |
| | 7/31/2007 | 3,609 | $60.73 | $219,174.57 |
| | 10/4/2007 | 2,574 | $67.18 | $172,921.32 |
| | 11/5/2007 | 1,111 | $52.13 | $57,916.43 |
| | | 10,482 | | $630,011.34 |
| | | | | |
| **WILKINSON** | 2/16/2007 | 3,763 | $59.25 | $222,957.75 |
| | | 3,763 | | $222,957.75 |
| | | | | |
| **WILLIAMS** | 10/17/2006 | 10,951 | $57.91 | $634,172.41 |
| | 1/24/2007 | 5,299 | $56.51 | $299,446.49 |
| | 3/12/2007 | 5,626 | $55.09 | $309,936.34 |
| | 10/17/2007 | 10,736 | $62.99 | $676,260.64 |
| | 11/5/2007 | 6,323 | $52.13 | $329,617.99 |
| | | 38,935 | | $2,249,433.87 |
| | | | | |
| **TOTAL** | | 240,184 | | $13,865,498.80 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.    Plaintiff brings this action derivatively in the right and for the benefit of Fannie Mae to redress injuries suffered, and to be suffered, by Fannie Mae as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. Fannie Mae is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.    Plaintiff will adequately and fairly represent the interests of Fannie Mae in enforcing and prosecuting its rights.

79.    Plaintiff is and was an owner of the stock of Fannie Mae during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

80.    The current Board of Fannie Mae consists of the following thirteen individuals: defendants Mudd, Ashley, Pickett, Swygert, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines, Horn, Freeh and Sites.

81.    Defendants Mudd, Ashley, Pickett, Swygert, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines, Horn, Freeh and Sites, as members of the Board during the Relevant Period, failed to take action to direct Fannie Mae to accurately report the effect that the subprime mortgage crisis would have on Fannie Mae's business prospects. Instead, Fannie Mae merely issued monthly reports concerning the gross value of its mortgage portfolio. Moreover, before the Relevant Period, Fannie Mae had not filed a financial report with the SEC since 2004 due to an earlier accounting scandal. These defendants' failure to act amounts to bad faith because it was a conscious and intentional disregard of their responsibilities. Further, their failure to act in the face of the subprime mortgage crisis was not the product of valid business judgment. Accordingly, demand is futile as to defendants Mudd, Ashley, Pickett, Swygert, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines, Horn, Freeh and Sites.

82.    Defendants Mudd, Ashley, Pickett, Swygert, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines and Horn, as members of the Board during May 2006, authorized a share repurchase program under which the Company repurchased over $2.6 million worth of its own shares at artificially inflated prices. The Board's decision to authorize the repurchase program was not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider the negative effects that the subprime mortgage crisis would have on the Company's business prospects. Further, defendants Mudd and Swygert engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

83.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding Fannie Mae's true business prospects. While in possession of this material adverse non-public information regarding the Company, the following current members of the Fannie Mae Board participated in the illegal insider selling by selling the following amounts:

(a)    while in possession of adverse non-public information, Mudd sold 42,606 shares of Fannie Mae stock for proceeds of $2,342,304.24; and

(b)    while in possession of adverse non-public information, Pickett sold 2,904 shares of Fannie Mae stock for proceeds of $170,784.24.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

84.    Defendants Ashley, Beresford, Horn, Smith and Wulff, were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter provides that the Audit Committee is responsible for reviewing and discussing financial information and earnings guidance provided to analysts and rating agencies. In particular, the Audit Committee charter provides as follows:

> The duties and responsibilities of the Committee shall include:
>
> *    *    *
>
> Reviewing earnings releases and reviewing and discussing generally the types of information to be disclosed and the type of presentations to be made, including the use of "non-GAAP financial measures," in the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies. Such reviews are to be made prior to the issuance of the press release or the disclosure of such information or making of such presentation, as applicable.

Thus, the Audit Committee was responsible for overseeing and directly participating in the dissemination of Fannie Mae's public statements. Accordingly, defendants Ashley, Beresford, Horn, Smith and Wulff breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper statements that contained improper material information. Particularly, these defendants reviewed and failed to correct Fannie Mae's improper statements described above. Thus, Ashley, Beresford, Horn, Smith and Wulff face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

85.    The principal professional occupation of Mudd is his employment with Fannie Mae, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Fannie Mae paid Mudd the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $950,000 | $4,799,057 | $962,112 | $3,500,000 | $932,958 | $136,072 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $908,121 | $2,591,875 | $9,487,221 | | | $155,539 |
| 2004 | $743,895 | - | $5,524,381 | - | - | $63,815 |
| 2003 | $714,063 | $1,288,189 | - | 105,749 | $4,674,015 | $135,989 |
| 2002 | $689,124 | $911,250 | - | 82,918 | $2,339,702 | $64,454 |
| 2001 | $656,429 | $1,083,109 | - | 87,194 | $1,188,846 | $9,732 |
| 2000 | $537,063 | $735,130 | $1,319,533 | 321,295 | $414,090 | $607,848 |

Accordingly, Mudd lacks independence from defendants Ashley, Freeh, Gaines, Macaskill and Smith, defendants who are not disinterested and/or independent and who exert influence over Mudd's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Mudd's base salary, bonus and equity compensation. This lack of independence renders defendant Mudd incapable of impartially considering a demand to commence and vigorously prosecute this action.

86.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

87.    The Director Defendants of Fannie Mae, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Fannie Mae's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are, therefore, not disinterested parties.

88.    The acts complained of constitute violations of the Exchange Act and violations of fiduciary duties owed by Fannie Mae's officers and directors and these acts are incapable of ratification.

89.    Each of the Director Defendants of Fannie Mae authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various

-31-

improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

90.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for Fannie Mae for any of the wrongdoing alleged by plaintiff herein.

91.    Plaintiff has not made any demand on shareholders of Fannie Mae to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Fannie Mae is a publicly held company with over 978 million shares outstanding, and over thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Derivatively Against the Director Defendants and Defendant Blakely for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

92.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.    During the Relevant Period, the Director Defendants and defendant Blakely disseminated or approved public statements that improperly portrayed Fannie Mae's business prospects, growth and margins.  The Director Defendants and defendant Blakely knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

94.    The Insider Selling Defendants also sold over $13 million worth of shares of Fannie Mae's common stock at inflated prices during the Relevant Period while in possession of material non-public information.  These defendants misappropriated Fannie Mae's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Fannie Mae stock without disclosing the information alleged to have been concealed herein.

95.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Fannie Mae's business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Blakely were causing Fannie Mae to repurchase over $2.6 million worth of its own stock on the open market at an average inflated price of approximately $59.32 per share, which is substantially higher than Fannie Mae's current share price of under $30 per share.

96.    As such, the Director Defendants and defendant Blakely violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Fannie Mae and others in connection with their purchases of Fannie Mae common stock during the Relevant Period.

97.    As a result of the Director Defendants' and defendant Blakely's misconduct, Fannie Mae has and will suffer damages in that it paid artificially inflated prices for Fannie Mae common stock purchased on the open market. Fannie Mae would not have purchased Fannie Mae common stock at the prices it paid, had the market previously been aware that the market price of Fannie Mae's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Fannie Mae suffered damages in connection with its purchases of Fannie Mae common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Blakely are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against Defendants Mudd, Blakely, Ashley, Beresford, Horn, Smith and Wulff for Violation of §20(a) of the Exchange Act

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     Defendant Mudd, Fannie Mae's Chairman and CEO, defendant Blakely, Fannie Mae's former CFO, and defendants Ashley, Beresford, Horn, Smith and Wulff as members of the Audit Committee, directly or indirectly controlled or induced the Individual Defendants who violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

100.    These defendants are jointly and severally liable to the same extent as the Individual Defendants under §20(a) of the Exchange Act.  These defendants did not act in good faith.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    The Individual Defendants owed and owe Fannie Mae fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Fannie Mae the highest obligation of good faith, fair dealing, loyalty and due care.

103.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

104.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects.  The Individual Defendants caused the Company to misrepresent its business prospects by failing to direct the issuance of statements concerning the effect of the subprime mortgage crisis on those prospects. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Fannie Mae has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

106.    Plaintiff, on behalf of Fannie Mae, has no adequate remedy at law.

## COUNT IV

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Fannie Mae common stock on the basis of such information.

109.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Fannie Mae common stock.

110.    At the time of their stock sales, the Insider Selling Defendants knew that Fannie Mae was exposed to the subprime mortgage crisis and that the Company's Relevant Period statements concealed the full extent of that exposure. The Insider Selling Defendants' sales of Fannie Mae common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

111.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, the Individual Defendants wasted corporate assets by paying bonuses to certain of its executive officers and incurring potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

114.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

115.    Plaintiff, on behalf of Fannie Mae, has no adequate remedy at law.

## COUNT VI

### Against the Officer and Insider Selling Defendants for Unjust Enrichment

116.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.    By their wrongful acts and omissions, the Officer and Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of Fannie Mae.

118.    Plaintiff, as a shareholder and representative of Fannie Mae, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Director Defendants and defendant Blakely are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and that defendants Mudd, Blakely, Ashley, Beresford, Horn, Smith and Wulff are jointly and severally liable under §20(a) of the Exchange Act  and awarding Fannie Mae damages;

C.    Directing Fannie Mae to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fannie Mae and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Fannie Mae to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the accuracy of the qualifications of Fannie Mae's directors, executives and other employees;

4.    a proposal to control insider selling;

5.    a provision to ensure that Fannie Mae prudently expends funds in stock repurchase programs; and

6.    appropriately test and then strengthen the internal audit and control functions.

D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Fannie Mae has an effective remedy;

E.    Awarding to Fannie Mae restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

-37 -

G.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 26, 2007                THE MASON LAW FIRM, LLP


GARY E. MASON
DC Bar #418073
1225 19th Street N.W.
Suite 500
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile:  (202) 429-2294

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
ASHLEY R. PALMER
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

298323_9

## VERIFICATION

I, Brian J. Robbins, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the Fannie Mae f/k/a Federal National Mortgage Association action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 21st day of November, 2007, at San Diego, California

_____
BRIAN J. ROBBINS

E
07-2130
PLF

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS**

Patricia Browne Arthur, derivatively on behalf of Fannie Mae, f/k/a Federal National Mortgage Association

**DEFENDANTS**

Daniel Mudd, et al

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

The Mason Law Firm, LLP
Gary Mason
1225 19th Street, NW, Suite 500
Washington, DC 20036 202-429-2290

AT

Case: 1:07-cv-02130
Assigned To : Friedman, Paul L.
Assign. Date : 11/26/2007
Description: General Civil

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
◉ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ◉ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

⊗ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
⊗ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

㉖

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Article III of the United States Constitution and 28 U.S.C. §1331, 28 U.S.C. §1367(a), 28 U.S.C. §1332(a)(2)

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☐   If yes, please complete related case form.

DATE   Nov. 26, 2007   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.